*845
 
 PER CURIAM.
 
 [1]
 

 | ]The Court has before it a motion by defendant, in his own right and through counsel, to waive direct review of his conviction for first degree murder and sentence to death in accord with his expressed desire to forego any and all post-verdict and post-conviction remedies and to proceed directly to execution. Although well over 100 defendants have to one extent or another waived direct review of their convictions and death sentences in the other 35 state jurisdictions providing for capital punishment,
 
 [2]
 
 Gerald Bordelon is only the second defendant in this state to assert a waiver of his right to appeal in a capital case since Louisiana adopted the bifurcated capital sentencing procedures approved by the Supreme Court in
 
 Gregg v. Georgia,
 
 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 12(1976). He is also the first to do so from the day that the district court formally sentenced him to death.
 
 [3]
 
 The question of
 
 *846
 
 whether, to what extent, and under what circumstances, a defendant may waive appellate review of his conviction for a capital crime and sentence to death in Louisiana is squarely before the Court.
 

 The state charged defendant by grand jury indictment returned on January 9, 2003, with first degree murder following discovery of the body of his 12-year-old stepdaughter, Courtney LeBlanc, in a wooded area by the Amite River west of Denham Springs, Louisiana. The state alleged that she had died during the commission of an aggravated or forcible rape, or second degree kidnapping. She had disappeared from the trailer in which she lived with her mother and a younger sister outside of Denham Springs, in Livingston Parish, on the morning of November 15, 2002, and the police did not find her body until the late afternoon of November 26, 2002, when defendant led them to a riverside location across the parish line in East Baton Rouge Parish. Defendant subsequently confessed in the Detective Unit of the East Baton Rouge Parish Sheriffs Office that he had entered the trailer on the morning of November 15, 2002, abducted Courtney with the aid of a knife he had grabbed in the kitchen, transported her in his car to Mississippi where he forced her to have oral sex, then drove back to Louisiana and strangled |3her to death on the banks of the Amite River, concealing her body in the heavy underbrush.
 

 After trial by jury in June, 2006, defendant was found guilty as charged. The penalty phase that followed began with a waiver by defendant of his right to present mitigating evidence, although the defense had actively contested the state’s case at the guilt stage on the premise that Courtney’s mother, Jennifer Kocke, defendant’s wife, had actually committed the murder and then given him directions to find where she had hidden the body of her child, and that defendant had then confessed to the crime to spare his wife. Following a brief penalty phase, the jury returned a sentence of death following deliberation of less than an hour. The jury found as an aggravating circumstance that the victim had died during the commission or attempted commission of aggravated rape or second degree kidnapping. La. C. Cr. P. art. 905.4(A)(1).
 

 On November 6, 2006, the date set for formal sentencing, defendant filed his first of several motions to waive direct appeal. In that pro se motion, defendant asserted his right to waive direct appeal and any subsequent post-conviction proceedings but acknowledged that he could not waive this Court’s Rule 28 review and he therefore asked the trial court to lodge the record on appeal in this Court solely for that purpose. In support of his motion, defendant personally addressed the court as follows:
 

 I don’t think I’m wrong according to what the Louisiana Code of Criminal Procedure states. The right of an appeal provided by the capital defendants in the Louisiana Code of Criminal Procedure, Article 912.1, it’s just that. It’s a right. Rights can be waivefd], just like I had the right to remain silent throughout the whole trial. Just like I had the right not to put up mitigating evidence at the sentencing phase of the trial. I had those rights. That’s my right. And my right is also to waive any right of appeal.
 

 |/The Louisiana Criminal Code of Procedure clearly states that. Article 5, as I’m sure you’re aware of, ‘shall,’ is man
 
 *847
 
 datory, ‘may,’ is permissive. The word, ‘may,’ is used in article 912.1. It states, ‘The defendant may appeal to the Supreme Court from a judgement in a capital cases in which a sentence of death actually has been imposed. ‘Shall,’ is mandatory. ‘May,’ is not....
 

 905.9 and 905.9.1 require a review for excessive sentence of a death sentence by the Louisiana Supreme Court. That’s mandatory, but it’s mandatory that they review the excessive sentence, not an appeal. That’s the only thing that’s mandatory is for them to rule whether or not the sentence is excessive or not.... I don’t think I’m wrong on that. I think I have a right to waive it, and that’s what I’d like to do.
 

 After considering and denying a motion for a new trial filed and argued by the Capital Appeals Project of Louisiana over defendant’s objection, and after formally sentencing defendant to death, the trial court then addressed the motion to waive appeal and denied it. “[I]t’s my understanding and belief that the law in Louisiana requires an appeal,” the trial judge informed defendant, “and so an appeal you shall get.” The court then signed a motion for appeal filed by the Capital Appeals Project.
 

 The record on appeal was lodged in this Court on March 13, 2007. On the following day, this Court received a motion from Jill Craft, a private attorney in Baton Rouge representing defendant’s interests, asserting his right to waive the appeal. The motion attached defendant’s pro se motion to waive his appeal filed in the district court and an affidavit by defendant attesting that he persisted in his desire to waive appeal and articulating the reasons why he wished to terminate appellate review of his conviction and sentence, namely, that he is guilty of the crime for which he has been convicted, that he has no desire to prolong the pain he has inflicted on the victim’s family and his own family, and that he would commit the same crime again if ever given the chance. Craft’s motion also conceded that 15despite defendant’s waiver of his appellate rights, “pursuant to La. C. Cr. P. art. 905.9, the Court is obligated to perform an excessiveness review.”
 

 Shortly thereafter, the Court received a motion from the Capital Appeals Project seeking to enroll formally as counsel of record on appeal for defendant and requesting that this Court refer defendant’s motion to waive appeal to the merits of the appeal. This Court deferred acting on defendant’s motion to dismiss his appeal, denied the Capital Appeal Project’s request to refer defendant’s motion to the merits, and deferred acting on the Project’s motion to enroll as counsel for defendant. The Court remanded the case to the district court with instructions that the court convene a sanity commission for purposes of determining the defendant’s competency to make a knowing and intelligent waiver of his capital appeal.
 
 State v. Bordelon,
 
 07-0525 (La.5/7/07) (unpub’d).
 

 In compliance with this Court’s remand order, the trial court appointed a sanity commission composed of Drs. Jose Arteco-na and Herbert W. LeBourgeois, both psychiatrists employed by the Tulane University School of Medicine. The court also enlarged the scope of our remand order by directing the psychiatrists to determine whether defendant is competent to proceed to execution,
 
 i.e.,
 
 whether he understands that he is to be executed and the reason why he is to suffer that penalty.
 
 See
 
 La. R.S. 15:567.1;
 
 Ford v. Wainwright,
 
 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986). The psychiatrists conducted a wide-ranging investigation including extensive interviews with defendant and reported to the court that defen
 
 *848
 
 dant is competent to make a knowing and intelligent waiver of his appeal and otherwise competent to act in his own interest although he fully understands he is to be executed for the murder of Courtney Le-Blanc. After a hearing conducted on July 8, 2007, at which both psychiatrists testified, the district court found |,¡defendant competent to waive his appellate rights and to proceed to execution, and ordered the record of the competency proceedings lodged in this Court as a supplemental record on appeal. Defendant was represented at that hearing by Ms. Craft. The court had formally enrolled her in April, 2007, as counsel of record for defendant, thereby relieving the Capital Appeals Project of any duty to represent him on appeal.
 

 On December 10, 2008, this Court then issued an order directing counsel for the state and defendant to brief specific questions raised by defendant’s stated desire to waive his appellate rights and post-conviction remedies to the fullest extent permitted by law.
 
 State v. Bordelon,
 
 07-0525 (La.12/10/08) (unpub’d). In particular, the Court directed the parties to address: (1) whether the record supports the finding of the trial court that defendant is competent to waive his appeal; and (2) whether a defendant in Louisiana may waive his right to appellate review of his conviction and sentence in a capital case and, if so, whether defendant expressly waived his right to appellate review of his conviction and sentence. The Court further directed the parties to file sentence review memoranda pursuant to La. S.Ct. Rule 28. On January 14, 2009, this Court then denied the motion of the Capital Appeals Project to enroll as appellate counsel of record for defendant.
 

 In compliance with this Court’s directive of December 10, 2008, the state and counsel for defendant have filed briefs addressing the specific questions raised by the Court and sentence review memoranda in compliance with Rule 28. The parties agree on the analytical framework for addressing defendant’s motion to waive appeal, on the findings of the sanity commission and the trial court with respect to defendant’s capacity to make a knowing and intelligent waiver of his |7appeal, and on the ultimate result in this case: that death is the appropriate punishment of defendant for his crime. For the reasons that follow, we grant defendant’s motion and dismiss the appeal.
 

 The tight to waive appeal in a capital case in Louisiana
 

 The United States Supreme Court has not expressly held whether the Eighth Amendment does or does not permit a defendant to waive appellate review in a capital case. The Court has held that third parties may not intervene in a competent defendant’s decision to terminate further legal proceedings in his case after he has been sentenced to death.
 
 Whitmore v. Arkansas,
 
 495 U.S. 149, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990);
 
 Gilmore v. Utah,
 
 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632 (1976). The Court has thereby pretermitted the question of whether the Eighth Amendment allows the execution of death row inmates who had not had their convictions and sentences reviewed by any appellate court on grounds that the third party interveners have no standing to assert an Eighth Amendment claim that a defendant may not waive state appellate review in a capital case in which the state courts have expressly determined that defendant has the capacity to make a knowing and intelligent waiver of his right to appellate review.
 
 See Whitmore,
 
 495 U.S. at 155, 110 S.Ct. at 1723 (“Our threshold inquiry into standing in no way depends on the merits of the [petitioner’s] contention that a particular conduct is illegal, and we
 
 *849
 
 thus put aside for now Whitmore’s Eighth Amendment challenge ... .”)(internal quotation marks and citation omitted). The majority in
 
 Whitmore
 
 thereby rejected the view of the dissent that “[gjiven the extraordinary circumstances of this case ... consideration of whether federal common law precludes Jonas Whitmore’s standing as Ronald Simmons’ next friend should be informed by a consideration of the merits of Whitmore’s claim.... Our cases and | xstate courts’ experience with capital cases compel the conclusion that the Eighth and Fourteenth Amendments require appellate review of at least death sentences to prevent unjust executions.... The core concern of all our death penalty decisions is that States take steps to ensure to the greatest extent possible that no person is wrongfully executed.”
 
 Whitmore,
 
 495 U.S. at 167-71, 110 S.Ct. at 1729-32 (Marshall, J., dissenting).
 

 However, although it has not resolved the larger Eighth Amendment question and has thus left the states free to provide their own answers, the Supreme Court has also recognized at least in principle that a competent defendant’s decision to forego appellate review in a capital case may reflect a rational act of self-determination despite its potential consequences.
 
 Rees v. Peyton,
 
 384 U.S. 312, 314, 86 S.Ct. 1505, 1506, 16 L.Ed.2d 583 (1966)(in aid of its certiorari jurisdiction, Court remands the case to the district court to determine Rees’ mental condition and to report back to the Court on the question of “whether he has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises.”).
 

 In the present case, we need not resolve the Eighth Amendment question left open in
 
 Whitmore
 
 whether a defendant may entirely forego appellate review of his capital conviction and sentence because the Louisiana legislature has provided for sentence review in every capital case in which a defendant has actually been sentenced to death and has thereby provided the appropriate procedure for cases in which the defendant otherwise waives his right to appeal his conviction and sentence. As an initial matter, we agree with defendant that while La. Const, art. 1,1 ¡,§ 19 guarantees that “[n]o person shall be subjected to imprisonment or forfeiture of rights or property without the right of judicial review,” the article also provides without qualification that this right “may be intelligently waived.” The right of waiver is personal to the defendant,
 
 State v. Marcell,
 
 320 So.2d 195, 198 (La.1975), and the waiver “must be an informed one.”
 
 State v. Simmons,
 
 390 So.2d 504, 506 (La.1980). Thus, while a defendant
 
 “may
 
 appeal to the supreme court from a judgment in a capital case in which a sentence of death actually has been imposed,” La. C. Cr. P. art. 912.1(A) (emphasis added), he is not required to do so. In this respect, Louisiana does not follow the law in other capital jurisdictions in which an appeal is mandatory.
 
 See, e.g.,
 
 Deering’s California Codes, Penal Code Ann.2008 § 1239(b)(“When upon any plea a judgment of death is rendered, an appeal is automatically taken by the defendant without any action by him or her or his or her counsel.”); Fla.Stat.Ann. § 921.141(4)(West 2006)(“The judgment of conviction and sentence of death shall be subject to automatic review by the Supreme Court of Florida and disposition rendered within 2 years after the filing of a notice of appeal.”). Thus, in a capital case as in any other case, a defendant in Louisiana possesses the right to make a knowing and intelligent waiver of his right to direct appeal as he may waive any other
 
 *850
 
 constitutional right relating to the trial of criminal cases.
 
 [4]
 

 See Illinois v. Rodriguez,
 
 497 U.S. 177, 183, 110 S.Ct. 2793, 2798, 111 L.Ed.2d 148 (1990)(“We have been unyielding in our insistence that a defendant’s waiver of his trial rights cannot be given effect unless it is ‘knowing’ |]nand ‘intelligent.’ ”)(citing
 
 Colorado v. Spring,
 
 479 U.S. 564, 574-75, 107 S.Ct. 851, 857-58, 93 L.Ed.2d 954 (1987);
 
 Johnson v. Zerbst,
 
 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)); see
 
 also Whitmore,
 
 495 U.S. at 165, 110 S.Ct. at 1728 (prerequisite for “next Mend” standing, that the “real party in interest is unable to litigate his own cause due to mental incapacity, lack of access to court, or other similar disability .... is not satisfied where an evidentiary hearing shows that the defendant has given a knowing, intelligent, and voluntary waiver of his right to proceed, and his access to court is otherwise unimpeded.”)(citing Gilmore);
 
 cf. Franz v. State,
 
 296 Ark. 181, 754 S.W.2d 839, 843 (1988)(waiver of capital appeal valid only if defendant has “the capacity to understand the choice between life and death and to knowingly and intelligently waive any and all rights to appeal his sentence.”);
 
 Geary v. State,
 
 115 Nev. 79, 977 P.2d 344, 346 (1999)(defendant’s decision to waive review of his capital sentence must be shown to be “intelligently made and with full comprehension of its ramifications.”);
 
 State v. Sagastegui,
 
 135 Wash.2d 67, 83, 954 P.2d 1311, 1320 (1998)(valid waiver of capital appeal if defendant has the capacity to understand the choice between life and death and to knowingly and intelligently forgo any and all rights to appeal his sentence)(citing Whitmore).
 

 However, as defendant acknowledged in arguing his motion before the trial court at formal sentencing, his unqualified right to intelligently waive his right of review as a matter of La. Const, art. I, § 19, does not encompass or discharge this Court’s independent duty imposed by La. C. Cr. P. art. 905.9 to review every death sentence returned in Louisiana for excessiveness according to rules adopted by the Court “as necessary to satisfy constitutional criteria for review.” Article 905.9 originated in 1976 La. Acts 694, and the legislature thereby placed on this Court the duty to review a sentence of death for excessiveness nearly three years before lathis Court decided as a general matter that La. Const. Art. I, § 20, which prohibits “cruel, excessive or unusual punishment,” made “the excessiveness of a sentence ... a question of law reviewable under the appellate jurisdiction of this court.”
 
 State v. Sepulvado,
 
 367 So.2d 762, 764 (La.1979).
 

 Pursuant to art. 905.9, this Court adopted its Rule 28 providing for criteria for reviewing a death sentence for exces-siveness, including consideration of whether the sentence was imposed under the influence of any arbitrary factors,
 
 see State v. Thibodeaux,
 
 98-1673, p. 15 (La.9/8/99), 750 So.2d 916, 928 (“In the context of Rule 28 review, the existence of an arbitrary factor requires this court to find an error of such magnitude that it undermines confidence in the jury’s sentencing verdict.”), and whether the evidence supports the jury’s finding of at least one aggravating
 
 *851
 
 circumstance. The latter inquiry that will invariably entail a finding of whether the evidence also supported the jury’s finding of guilt because of Louisiana’s procedure of “double counting” aggravating factors at the guilt and sentencing stages.
 
 See Lowenfield v. Phelps,
 
 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988)(Louisiana’s scheme of duplicating aggravating circumstances in the guilt and sentencing states of a capital trial does not violate the Eighth Amendment because it sufficiently narrows the class of offender eligible for capital punishment). The criteria in Rule 28 provide this Court with the means of satisfying Eighth Amendment concerns raised by a defendant’s waiver of appellate review of his conviction and sentence of death in this state by “safeguarding] a defendant’s right not to suffer cruel and unusual punishment,” and by “protecting] society’s fundamental interest in ensuring that the coercive power of the State is not employed in a manner that shocks the community’s conscience or undermines the | ^integrity of our criminal justice system.”
 
 Whitmore,
 
 495 U.S. at 171-72, 110 S.Ct. at 1731-32 (Marshall, J., dissenting).
 

 Louisiana thus belongs in the overwhelming majority of other state capital jurisdictions in which some measure of appellate review is accorded a defendant in every capital case, including Arkansas, which changed its rule after
 
 Whitmore
 
 to require review of both the guilt and sentencing stages of trial for fundamental error despite defendant’s waiver of his appeal.
 
 Newman v. State,
 
 350 Ark. 51, 84 S.W.3d 443 (2002);
 
 State v. Robbins,
 
 339 Ark. 379, 5 S.W.3d 51 (1999);
 
 see
 
 U.S. Dept. of Justice, Bureau of Justice Statistics, Bull., Capital Punishment, 2005 (Dec.2005). Within that consensus in capital jurisdictions are states, such as California and Florida, in which an appeal is automatic, and other states which permit waiver of direct appeal and confine appellate review to the equivalent of Rule 28 review.
 
 See, e.g., Patterson v. Commonwealth,
 
 262 Va. 301, 551 S.E.2d 332, 335 (2001)(“While a defendant may waive his rights of appellate review and instruct his attorneys to refrain from seeking a commutation of his death sentence, a defendant may not waive the review process mandated by Code § 17.1-313(0,” the purpose of which “is to assure the fair and proper application of the death penalty statutes in this Commonwealth and to instill public confidence in the administration of justice.”)(internal quotation marks and citation omitted); see
 
 also Pennell v. State,
 
 604 A.2d 1368, 1375 (Del.1992)(knowing and intelligent waiver of appellate rights in capital case did not forego review of death sentence);
 
 State v. Sagastegui,
 
 135 Wash.2d at 82-83, 954 P.2d at 1319 (competent defendant may waive appellate review but not mandatory sentence review under Wash. Rev.Code Ann. § 10.95.130 (West 2002)).
 

 11-While a defendant convicted of first degree murder and actually sentenced to death has the same right as any other defendant to waive direct appeal of his conviction and sentence, the unique severity of capital punishment requires unique procedures for assuring that any waiver is made knowingly and intelligently. In
 
 Whitmore,
 
 the Court noted that the Supreme Court of Arkansas required a competency hearing as a matter of state law and that the court had affirmed the trial court’s finding that the capital inmate had “ ‘the capacity to understand the choice between life and death and to knowingly and intelligently waive any and all rights to appeal his sentence.’ ”
 
 Whitmore,
 
 495 U.S. at 165, 110 S.Ct. at 1728 (citation omitted). The Supreme Court further observed, consistent with its decision in
 
 Rees,
 
 that “[although we are not here faced with the question of whether a hearing on mental competency is required by the United
 
 *852
 
 States Constitution whenever a capital defendant desires to terminate further proceedings, such a hearing will obviously bear on whether the defendant is able to proceed on his own behalf.”
 
 Whitmore,
 
 495 U.S. at 165, 110 S.Ct. at 1728.
 

 When this Court remanded this case in May, 2007, for a determination of defendant’s competency to waive appeal, we explicitly cited to
 
 Rees
 
 and
 
 Whitmore
 
 in support of finding that the sanity commission authorized by La. C. Cr. P. art. 644, although designed primarily to determine a defendant’s competency to stand trial, also provides a suitable vehicle for determining whether a defendant is competent to waive his direct appeal rights in a capital case in which he has been sentenced to death or whether he suffers from “a mental disease, disorder, or defect which may substantially affect his capacity,” to make a knowing and intelligent waiver of appellate review.
 
 Rees,
 
 384 U.S. at 314, 86 S.Ct. at 1506;
 
 cf. State v. Dunn,
 
 07-0878 (La.1/25/08), 974 So.2d 658 (retaining procedures set out in
 
 State v. Williams,
 
 01-1650 (La.11/1/02), 831 So.2d 835, including appointment of a sanity commissions, for resolving claims raised in a post-verdict, post-sentencing stage of a capital case that defendant is mentally retarded and so exempt from capital punishment under
 
 Atkins v. Virginia,
 
 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)). When a defendant asserts that he is eligible for execution because he has terminated all further legal proceedings, the consequences of an erroneous determination of his competency to make that decision are so severe that the record of the proceedings conducted on the sanity commission’s findings must show by clear and convincing evidence that he has the capacity to make a knowing, intelligent, and voluntary waiver of his right to appellate review of his capital conviction and sentence of death.
 

 Defendant’s Competency to Waive Appeal
 

 Following their appointment to the sanity commission by the trial court, Drs. Artecona and LeBourgeois interviewed defendant on four occasions in the Livingston Parish Jail: twice on June 13, 2007; and twice on June 25, 2007. The total interview time exceeded eight hours and Dr. Artecona estimated that he and Dr. Le-Bourgeois spent approximately 30 to 40 hours overall in conducting the evaluation. The psychiatrists also reviewed defendant’s medical records including prison mental health care documentation from East Baton Rouge Parish Prison, the Livingston Parish Jail, and the penitentiary at Angola, as well as earlier records from Greenwell Springs Hospital, located just north of Denham Springs, where defendant spent several months as an adolescent. They also interviewed relatives of defendant, including his mother and sister. In addition, the psychiatrists engaged Dr. David Hales, a psychologist, to conduct neuropsychological testing to determine whether defendant suffers from any organic brain impairments and 11Rwhether he is mentally retarded. The psychiatrists further consulted with Dr. Marc Zimmerman who had performed some psychological testing of defendant in preparation for the sentencing stage of the trial. As Dr. Ar-tecona explained at the hearing conducted on the sanity commission’s reports on July 3, 2007, the psychiatrists conducted their wide-ranging inquiry to evaluate defendant’s “psychiatric state and his present mental capacity ... whether a mental disease or defect exists that would impair his ability to reason ... his capacity to make a knowing, intelligent and voluntary waiver of his right to appellate review and also further, to see whether there was a mental disease or defect that would impair his
 
 *853
 
 ability to understand that he is to be executed and the reasons for which he is to suffer that penalty.” The psychiatrists were well qualified for the task. Both are professors of forensic psychiatry at Tulane Medical School and in particular, Dr. Le-Bourgeois is the director of forensic psychiatric training at the medical school, which he described as the only training program in the state to qualify physicians for board certification in forensic psychiatry.
 

 The psychiatrists submitted their findings to the court in separate 30-page reports. As summarized by Dr. Artecona at the hearing:
 

 One of the things that we had concerns about is to ensure that there wasn’t any mental illness influencing his present course of action. So we specifically focused on whether there existed any type of disorder that would affect his ability to think thorough a problem or to reason.
 

 We also noted that early on in his incarceration he was placed on suicide watch, allegedly because he told an FBI agent ... that he would rather be dead than to face his situation. Thereafter, after his incarceration, he also experienced tearfulness, despondency, anxiety, as well as recurrent nightmares. So we focused on that to ensure that that wasn’t present and influencing his current decision-making.
 

 As I described here in his ‘Adjustment in Jail’ section [of the report], he was treated for a while at the Livingston Parish Jail and thereafter at Angola, and symptoms completely disappeared and he’s no longer receiving | 16any psychotropic medication nor is he complaining of nightmares or any of the symptoms that he complained at that time.
 

 Based on that we gave him a diagnosis of adjustment disorder with depressed and anxious; but it is now fully in remission. I focused a lot on that because that would be a disease or a disorder that would affect or impair his ability to reason. But there’s been no signs of any of that now for quite a number ... for at least two years now....
 

 After we determined psychiatric diagnosis, we also looked at other diagnoses that may be present. Namely .... sexual sadism and antisocial personality disorder. And, in my opinion, with reasonable degree or medical certainty, those are current diagnoses, but in my experience these are not diagnoses that would affect one’s ability to reason or to make a logical choice.
 

 We corroborated a lot of our information with communications with the family who know him and who talked to him on a regular basis, with people who work at Angola. We talked to the social worker who has been assigned to death row and who interacts with Mr. Borde-lon on a regular basis. We talked to the warden, and we talked to a lot of people that have come in contact with him, to ensure that what we saw in our clinical interview was what was there.
 

 We also saw him for a very long period of time which would also indicate if somebody was trying to ‘mask’ or ‘put on a face,’ it’s very hard to maintain it for eight hours, or for a prolonged period of time. So we really wanted to be sure that there wasn’t something that we were missing.
 

 On the basis of all of that information, including a report from Dr. Hales that defendant does not suffer from organic brain damage and that his intelligence measures in the normal range, and discussions with Dr. Marc Zimmerman, whose findings agreed with those of Dr. Hales that defendant is not mentally retarded,
 
 *854
 
 Dr. Artecona concluded “with a reasonable degree of medical certainty” that defendant “is not suffering from a mental disease or defect that significantly affect[s] his ability to make a knowing, intelligent and voluntary waiver of his right to appellate [review].” The psychiatrist further concluded that defendant “is not suffering from a mental disease or defect that prevents him from understanding that he is to be executed and the reasons he is to suffer that penalty for.” Finally, Dr. Artecona misaddressed whether, in fact, defendant was making a knowing and intelligent waiver of the appellate process:
 

 Besides the psychological evaluation and testing, we spent a lot of time asking about his ... understanding of the crime that he’s been convicted of, his understanding of the death penalty, what happens at the point of death, what the plans have been, and, in our opinion, he’s making a well-reasoned choice, he’s making a logical choice. He feels that he confessed to his crime, that he did so in a voluntary and non-coerced manner. He stated at the time he was not under the influence of drugs. He was not suffering from any mental retardation.
 

 He further stated that he feels that the death penalty is just punishment for his crimes and he also often reiterated that he feels that the right to appellate review is a right and not a mandate. So that’s why.... He’s presenting that motion, or he feels very strongly that way.
 

 Mr. Bordelon also understands that the decision, whether he can waive this, is up to the Supreme Court, and he’s aware of that. He’s aware that if he’s not allowed to do so, he plans to waive his postconviction remedies.
 

 Thus, in the final analysis, Dr. Artecona concluded that defendant “understands why he’s making the decision that he’s making and that he’s able to so, and, furthermore, that there is no disease or defect that’s influencing or preventing him from being able to do so.” The psychiatrist had also addressed the possibility that, although he had ruled out a diagnosis of clinical depression, defendant was nevertheless motivated by suicidal ideation:
 

 We needed to assess suicidality: is this some kind of hidden attempt to commit state-assisted suicide? ... I felt that that was simply not the case. Mr. Bordelon ... told us that there’s been times in his life where he felt that he wonders ... if it was all worth it.... And there’s been times in his life when he’s felt down. But it’s never gotten to a point where he actually either planned suicide or attempted suicide.
 

 This was corroborated.... He was on suicide watch shortly after his arrival at East Baton Rouge [lock-up] but ever since he’s not been on suicide watch. This is corroborated by Angola State Penitentiary where he’s been doing fine. And furthermore, he tells us, you know, every time I go to a shower, I check out a double-edged razor. I have sheets in my bed. I could easily, if I were suicidal, I have plenty and ample opportunities to carry out the task, if that’s what I chose. And we asked both Mr. Midkiff [a social | iSworker at Angola], as well as the warden, and that was true, he has access to a blade and he has access to sheets....
 

 Furthermore, we also asked him what happens if you don’t succeed in your quest and the Supreme Court does not allow you to waive, or if they give you a life sentence? And he said, well, if they give me a life sentence, that’s what I’ll do. I think his quote was, ‘I’m not going to go to the Supreme Court and demand that they give me the death penalty.’
 

 
 *855
 
 In his testimony, Dr. LeBourgeois, who fully agreed with the conclusions of his colleague on the sanity commission, amplified on Dr. Artecona’s account of defendant’s stated reasons for waiving appellate review, attributing to them a mixture of hard realism and a measure of altruism. He testified that defendant freely conceded that he had committed the crime and that, for the death of his stepdaughter, he deserved the death penalty, and that if he succeeded in overturning his conviction and setting himself free there was a “99.9 percent sure” possibility he would commit a similar crime again. “Look at my record,” defendant informed the psychiatrists, “It’s got worse and worse every time.” As for defendant’s altruism, Dr. LeBourgeois testified that defendant “felt that the end of this case, through the carrying out on the death sentence, would give [his wife’s] family some peace” and that:
 

 if he did appeal and was granted either a new sentencing phase or a new trial, that a lot of things that happened before would happen again. His family might have to testify, his ex-wife’s family might have to testify. He said that he understood that the trial, the first trial, the first penalty phase were stressful enough for them and he didn’t want them to go back through that again. He understood the high-profile nature of his case and the stress it caused....
 

 He attained the overall belief that the greatest likelihood is that with continued appeals the same outlook would occur, that is, either he would remain ... with a life sentence or get the death penalty once again. So he sort of felt like it was somewhat futile to put everybody back through the same situation and cause more stress to his family when he really believes that the likelihood is the same outlook would occur.
 

 | iflThus, Dr. LeBourgeois concluded that defendant “may not be making a decision that most people in his circumstance would, and I or other people may not agree with his decision, but I think when he lays out his pattern of reasoning it starts to support that there’s not a major mental illness or mental defect that substantially detracts from his ability to make a knowing, intelligent and voluntary waiver.” Prompted by defendant’s attorney, Ms. Craft, to explain the impact of the personality disorders that he and Dr. Ar-tecona did diagnose in defendant,
 
 ie.,
 
 sexual sadism and anti-social personality disorder, Dr. LeBourgeois elaborated:
 

 Sexual sadism is not a major mood cognitive anxiety or psychotic disorder; will not typically detract from somebody’s ability to make these types of decisions. [Anti-] social personality disorder, it can be associated with someone making impulse decisions.
 

 It doesn’t seem to be the case here. Family members report that Mr. Borde-lon was saying before, when he was pretrial, that if I end up on [death row], then I would like to waive my appeals. Furthermore, he’s had a lot of time to think and to reflect on the consequences of his actions and his decisions. I don’t think he came up with this on the spur of the moment. At least that’s not what the records and collateral information supports.
 

 In addition to his principal diagnosis of sexual sadism and anti-social personality, Dr. LeBourgeois had also noted secondary features of marijuana abuse and adjustment disorder with mixed anxiety. However, while the psychiatrist entertained the possibility that defendant might still have access to the drug notwithstanding his incarceration, Dr. LeBourgeois found no evidence that defendant suffered from the residual effects of long-term chronic intoxi
 
 *856
 
 cation which could have an effect on cognition. The adjustment disorder was in remission and in the psychiatrist’s opinion was “not currently impacting on his ability to make the decisions he’s making at the present time.”
 

 The trial court brought the hearing to a close by asking Dr. LeBourgeois to address specifically the question of whether defendant may be mentally retarded. |?,nThe psychiatrist indicated that from his own interactions with defendant, he fully subscribed to the report of Dr. Hale that defendant’s measured IQ of 104 placed him in the normal range of intelligence, while his performance IQ in the 77th percentile placed him in the high average range. His report had also noted that Dr. Marc Zimmerman’s independent tests conducted pretrial indicated that defendant’s IQ is 87 still in the normal range, and that the psychologist had found no evidence of cognitive impairment. It thus remained Dr. LeBourgeois’s view, shared with Dr. Artecona and based on his professional opinion formed during the eight hours of personal interviews with defendant, that defendant is not mentally retarded.
 

 On the basis of the psychiatrists’ reports and testimony provided by Drs. LeBourgeois and
 
 Artecona, the
 
 trial court, after noting the exceptional thoroughness with which the psychiatrists had conducted their inquiry, made the following specific findings:
 

 (1) By “the strong weight of evidence and beyond a reasonable doubt,” defendant possesses the capacity to proceed; he does not suffer from a mental disease or defect “which may substantially or as a matter of fact, in any way affect his capacity to make a knowing, intelligent and voluntary waiver of his right to appellate review;”
 

 (2) Defendant possesses the capacity to understand the choice between life and death and possesses the capacity “to knowingly and intelligently waive his right to appeal his capital conviction and his sentence;”
 

 (3) For purposes of R.S. 15:567.1(B), governing execution of inmates on death row, defendant is competent to proceed to execution because he possesses the “competency to understand that he is to be executed and the reason for which he is to suffer that penalty;”
 

 (4) Defendant exhibits no signs of mental retardation and beyond a reasonable doubt does not have a subnormal IQ;
 

 (5) Defendant shows no signs of suicidal ideation or clinical depression, or any other mental disease or defect, and his waiver of appeal “is not an attempt on [his] part to simply commit legally assisted suicide.”
 

 LiAJthough we are mindful that defendant was represented at the hearing by counsel who supports his right to waive direct appeal and that the proceedings were therefore not adversarial in the sense that the psychiatrists were subjected to searching cross-examination with respect to the bases for their opinions, the record in this matter overwhelmingly supports the trial court’s finding that defendant is competent to waive appellate review of his conviction and capital sentence. We have before us not only the reports and testimony of Drs. Artecona and LeBourgeois at the hearing conducted on July 7, 2007, but also the internal evidence provided by the pro se motions defendant has filed in this Court asserting his waiver of direct appeal. Those motions included not only his original pro se motion filed in the district court at sentencing but also subsequent motions filed in this Court in November, 2008, and June, 2009, restating his desire to waive his appeal. The motions make clear that from the outset, defendant grasped the difference between his personal right of
 
 *857
 
 appeal as a matter of La. Const, art. I, § 19 and this Court’s independent duty as a matter of La. C. Cr. P. art. 905.9 to review every death sentence in Louisiana for excessiveness, and that his waiver of the former does not necessarily preclude the latter. In addition, his statement to the court at formal sentencing in support of his motion to waive appeal offers this Court ample evidence that he is capable of making a cogent and knowledgeable legal argument in support of his position. The testimony of the psychiatrists at the hearing excludes the reasonable possibility that defendant’s waiver has been influenced by organic brain impairment, mental retardation, or personality disorders that directly impair cognitive functioning. The testimony also excludes the reasonable possibility that defendant’s waiver is the product of despair and suicidal ideation. As Dr. Le-Bourgeois emphasized at the hearing, the sheer ^persistence with which defendant has pursued waiver of his appeal, a persistence that his continued in this Court for the past two years, indicates that his decision reflects a considered and consistent course of action according to what Dr. Artecona described as a “cost benefit” analysis that included defendant’s expressed willingness to accept life imprisonment if his present motion were denied and appellate review eventually led to reversal of his death sentence.
 

 The record of proceedings in the district court on remand of the case thus clearly and convincingly demonstrates that defendant is competent to make a knowing, intelligent, and voluntary waiver of his right to appeal his conviction and sentence of death and that he does waive direct appeal of his conviction and sentence. Accordingly, his motion is granted.
 

 Rule 28 Sentence Review
 

 As previously held, a defendant’s assertion of his personal right under La. Const. art. I, § 19 to waive judicial review does not encompass this Court’s independent duty to review a capital sentence according to the criteria established in Rule 28 to discharge the Court’s duty under La. C. Cr. P. art. 905.9,
 
 ie.,
 
 that it review every sentence of death to determine: (1) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factor; (2) whether the evidence supports the jury’s finding of a statutory aggravating circumstance; and (3) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. As required by Rule 28 to facilitate our review for excessiveness, the state and counsel for defendant have filed sentence review mem-oranda, the trial court has completed its Uniform Capital Sentence Report, and the Department of Probation and Parole has submitted a Capital Sentence Investigation Report. Our review of all of the | .¿¡available materials including the trial transcript reveals that defendant’s sentence is not excessive for reasons that follow.
 

 Aggravating Circumstances
 

 The jury returned as the aggravating circumstances in the penalty phase that Courtney LeBlanc died during the commission of or attempted commission of an aggravated rape and second degree kidnapping, crimes enumerated in La. C. Cr. P. art. 905.4(A)(1). The state resubmitted the evidence presented in the guilt stage in the sentencing stage under the authority of La. C. Cr. P. art. 905.2(A), and in this respect, Rule 28 review of the evidence supporting the jury’s return of the aggravating circumstance at the sentencing stage is also a review of the evidence supporting defendant’s conviction for first degree murder in the guilt phase.
 

 The evidence presented in the guilt phase showed the following. On Novem
 
 *858
 
 ber 7, 2002, defendant nearly died of electrocution while he worked on the electrical box of a trailer his estranged wife, Jennifer Kocke, had rented in the Highland Village Mobile Home Park on Linder Road in Denham Springs. Defendant and Kocke had met over the internet in 2000 and then married in the summer of 2001, moving from Louisiana to Mississippi with Kocke’s children, including Courtney Le-Blanc. They lived in a trailer on land owned by defendant’s parents outside of Gloster, Mississippi, but separated after Kocke learned over the Christmas holidays from Courtney and another of her daughters that defendant had touched them inappropriately. Kocke had immediately alerted Mississippi child protection services and defendant was ordered to leave the residence. However, defendant and Kocke remained in contact after she moved back to Louisiana, first to Donald-sonville and then to Denham Springs, where she rented the trailer in the Highland Park Mobile Home in October, 2002.
 

 | ^Although the trailer had appeared in good condition from the outside, Kocke described its interior as an “absolute disaster,” and defendant began working on various repairs to the trailer, including its electrical wiring which led to the accident on November 7, 2002. A neighbor recalled hearing a loud “pop” and when she looked out of her own trailer she saw defendant lying on the ground. Courtney LeBlanc had been helping him out that day and after calling her mother at work in a panic she then phoned 9-1-1, leading to the dispatch of medical personnel to the scene. They revived defendant and took him to the hospital for additional treatment, although he soon checked himself out against medical advice and went to the home of his sister, Cindy Landry, in Den-ham Springs.
 

 One week later, on the morning of November 15, 2002, Courtney LeBlanc disappeared from the trailer on Linder Road and was never seen alive again. On the previous day, Courtney had gone with her mother to the Our Lady of the Lake Hospital in nearby Baton Rouge where Jennifer Kocke’s brother had been taken in critical condition following a traffic accident. Kocke stayed overnight with her brother in the hospital but Courtney decided to return to the trailer, although she had never before spent the night there alone. A friend of Kocke’s took Courtney back to the trailer and they spoke with each other on their cellular phones several times over the course of the evening as Courtney continued to insist that she could spend the night alone. On the following afternoon, when Jennifer Kocke returned to the trailer from the hospital, Courtney was gone. The police were called at first with a report that Courtney may have run away from home. She had done so previously with the daughter of Cindy Landry, with whom Kocke had stayed for one week following her return to Louisiana.
 

 | ^Investigation into Courtney LeBlanc’s disappearance mushroomed almost immediately when F.B.I. agents, who were in the area to assist a multi-parish investigation into the serial killings that were plaguing Baton Rouge and its surrounding parishes at that time, joined to determine whether Courtney’s disappearance had any connection to the serial killings ultimately attributed to Derrick Todd Lee.
 
 See State v. Lee,
 
 05-2098 (La.1/16/08), 976 So.2d 109. In the course of ensuing investigation, the police interviewed defendant several times and the F.B.I. agents sent a questionnaire he had filled out to the Bureau’s Behavior Analysis Unit. The results of the analysis led the agents to focus their investigation on defendant and on November 22, 2002, they placed him under surveillance, following him that night into Mississippi, where
 
 *859
 
 he visited a graveyard close to his parents’ property in Gloster, but then lost contact with him in the darkness. Defendant was on parole at the time he travelled to Mississippi and the officers knew that he had violated the terms of his parole by paying a visit to the graveyard. However, they did not take defendant into custody to avoid jeopardizing the on-going investigation into Courtney LeBlanc’s disappearance and on November 26, 2006, F.B.I. Agent Glen Methvien asked defendant to come to the Denham Springs Police Department. He arrived in his own car which was later impounded and searched after his arrest later that afternoon. The agent also requested that Jennifer Kocke and defendant’s sister Cindy come to the station house to confront defendant according to a script prepared by the F.B.I. The women followed the script and individually informed defendant that if he wanted to have anything to do with them again that he should disclose whatever he knew about Courtney’s disappearance. After the women left the station house, defendant met with Agent Methvien and F.B.I. profiler Mary Ellen O’Toole. Defendant informed the agents that he wanted |26to speak with his sister Cindy once more and that afterwards he would take them where they needed to go.
 

 The agents placed defendant under arrest for the parole violation and then transported him to the home of Cindy Landry, where he spoke to his sister from the back of a patrol unit while she stood at the opened window outside of the vehicle. Finally, after approximately 20 minutes, Cindy Landry leaned inside the vehicle and hugged her brother goodbye. He then directed the agents to where the body of Courtney LeBlanc lay in the thick underbrush along the banks of the Amite River only minutes from his sister’s home. To reach the location, they crossed the Amite River and then looped back to its west bank inside East Baton Rouge Parish. When the officers found her body, the 12-year-old girl had on only a pair of shorts and a single tennis shoe. Nearby, the police found a tee-shirt partially buried in a tire track cut into the muddy access road leading to the riverbank and farther away, some four hundred feet from her body, a pair of red panties clinging to a clump of weeds. Not recovered on the scene but delivered to the police on that evening by Michael Cuchinelli was a large knife with a green handle. Cuchinelli had found it when he went fishing in the area two days earlier. He had picked the knife up because it looked useful for cutting bait but when he learned that the police had found a young girl’s body on the riverbank he returned to the area where he gave it to the police officers investigating the crime scene. A few days later, he went back with the police and retraced his steps to show exactly where he had found the knife in one of the water filled pot holes cut into the access road leading to the riverbank. The pothole was only 15 feet away from where the police had discovered Courtney LeBlanc’s body but Cuchinelli never saw it in the thick underbrush. Jennifer Kocke identified the knife found by Cuchinelli as one that had been in a block ofj^knives she kept in the kitchen of the trailer. She had discovered the knife missing after the disappearance of her daughter.
 

 The circumstances of when and how Courtney LeBlanc came to lie on the banks of the Amite River were sharply disputed at trial. Defendant gave a videotaped statement on the night of November 26, 2002 to F.B.I. Agent Methvien, in the Detective Unit of the East Baton Rouge Parish Sheriffs Office, where he had been taken because the victim’s body had been
 
 *860
 
 found across the parish line.
 
 [5]
 
 In his statement, defendant related that he had called his employer, Delta Concrete, at 6:00 a.m. on November 15, 2002, and learned that he would be on stand-by for the day. He decided to drive over to the Highland Village trailer park to spend a few hours at Jennifer Kocke’s trailer and when he walked inside through the back door, he was surprised to find Courtney alone and asleep on the couch. Defendant went back outside, drove out of the trailer park and left his car on a side road, and then walked back through the woods to Kocke’s trailer. He woke Courtney and told her to come with him. Defendant took a large butcher knife from the kitchen when they left the trailer and informed Courtney that he would kill her if she screamed or tried to run.
 

 Defendant then drove with the victim into Mississippi where he turned into the woods off a gravel road near Gloster, got Courtney out of the car, and told her to take off her clothes. Defendant then had the naked victim kneel in front of him and perform oral sex, ejaculating in her mouth. He had left the knife behind in the car and did not hold it to Courtney or threaten to kill her during the oral sex. When he was finished, Courtney put back on her tee shirt and shorts but carried her 18Sunderwear back to the car. Defendant then drove back to Louisiana and to the Amite River, where he got her out of the car, walked her toward the river bank, pushed her down, straddled her chest, and strangled her to death. In the struggle, Courtney’s tee shirt came off and the knife, which defendant had put in his back pocket when he got his stepdaughter out of his car, fell to the ground where Michael Cuchinelli later found it. When he left the scene, defendant discarded Courtney’s underwear which had been lying of the floorboard of his car. In this statement, defendant repeatedly denied that he had raped his stepdaughter vaginally or anally, although he eventually admitted that in the ride to Mississippi he had rubbed Courtney in both places but never penetrated her.
 

 The state corroborated defendant’s confession with the results of the autopsy on Courtney LeBlanc, which found that the hyoid bone in her neck had been broken, a telltale sign of strangulation. The state also introduced climatological data for the middle of November, 2002, collected from an automated weather station at Ryan Airfield in Baton Rouge, and testimony from Jeanie Tessmer, a forensic entomologist working for the Livingston Parish Mosquito Abatement District, who had examined fly larvae collected from the victim’s body. Tessmer testified that given the relatively cold and wet conditions that prevailed at the time of the victim’s disappearance, and the stage of development of the insect larvae, the postmortem interval from the time the body came to lie on the banks of the Amite River until it was discovered by the police on November 26, 2002, was somewhere between eight to 13 days, with November 16, 2002, as the highest probability for the date of death. That time line corresponded to the circumstances described by defendant in his confession. In addition, the state presented DNA evidence from Natasha Poe, a criminalist with the Louisiana State Police Crime Lab, who had |j>9examined various samples taken from the victim and from defendant’s car after the police impounded the vehicle. Poe did not find defendant’s DNA inside his stepdaughter but she did find evidence
 
 *861
 
 of seminal fluid in the girl’s cervix, although not in her vagina. Poe found that a sample removed from a large stain found on the transmission hump of the vehicle contained a high concentration of defendant’s DNA, “a lot of sperm,” according to the criminalist, at the highest level on her measurement scale, but not so great that it masked a second DNA donor mixed in the sample. The official laboratory report of the findings indicated that Courtney Le-Blanc could not be excluded as the second donor but Poe expressed her firm opinion that the DNA belonged to Courtney and in a concentration which indicated that it had come from either her vagina or her mouth. In closing argument, the state suggested to jurors that defendant had not been entirely forthcoming about the circumstances under which he abducted Courtney Le-Blanc and that a second sexual assault had occurred in the ear, either vaginal penetration, accounting for the presence of seminal fluid in the girl’s cervix, or a second act of oral sex in which he ejaculated into her mouth and she then spat out the fluid onto the transmission hump of the vehicle.
 

 The defense attacked the time line provided by defendant in his statement on the premise that if he were wrong about the date on which Courtney LeBlanc’s body was deposited by the Amite River, then jurors could not And any part of his confession worthy of belief. Called by the defense, Karl Kretser, a former Lieutenant in the East Baton Rouge Sheriffs Office, acknowledged that information the police had received from the pathologist who performed the autopsy indicated that the post mortem interval had been only three to five days, placing the victim’s death well after the date provided by defendant. Kretser | ^testified that after receiving the coroner’s opinion, he interviewed defendant on November 30, 2002, to account specifically for his whereabouts during the 11 days Courtney LeBlanc had been missing in attempt to confirm the time line provided by his videotaped statement. Kretser satisfied himself that defendant’s time line, not the coroner’s, represented an accurate accounting of the victim’s murder. However, he could not account for the red panties found at the scene. Given the cold, wet, and windy conditions which prevailed at the time, Kretser testified that the panties “could have been there a day or two but I wouldn’t have thought any longer than that.” In fact, when Jim Churchman from the state police crime lab attempted to photograph the panties on November 26, 2002, as part of the crime scene investigation, the underwear fell off the clump of weeds. Kretser speculated that defendant, who had stayed at the Budget Inn on the night of November 23, 2002, only a quarter of a mile from the victim’s body, may have revisited the scene and dropped the panties at that time.
 

 However, the defense had another theory, keyed to the testimony of its own forensic entomologist, Dr. Erin Watson, an assistant professor at Southeastern Louisiana University, who had once studied under Jeanie Tessmer and had taught at the University of Tennessee forensic anthropology facility known as the “Body Farm,” after its open field maintained for the purpose of investigating how human remains decompose under a variety of circumstances. According to Dr. Watson, based on the pertinent climatological data and the developmental stage of the fly larvae collected from the victim’s body, the post mortem interval appeared far shorter than calculated by Tessmer. Dr. Watson estimated that the most probable date for the victim’s death was either November 21 or 22, 2002. In addition, Dr. Phillip Cenac, a psychiatrist in Baton Rouge, testifying purely as a medical doctor, |31 informed ju
 
 *862
 
 rors that based on all of the pertinent data he had reviewed, Courtney LeBlanc “was dead four to five days” before the police found her body.
 
 [6]
 

 The defense called witnesses to establish that Jennifer Kocke had appeared hysterical after the electrical accident which nearly claimed defendant’s life but seemed unnaturally calm during the disappearance of her daughter, that Courtney had often acted as if she had been afraid of her mother, and that one witness, defendant’s niece, had, in fact, observed Jennifer Kocke on one occasion grab her daughter by her throat and choke her in a dispute over doing the laundry. In addition, the autopsy results indicated that acetone was present in the victim’s blood which defense counsel suggested may have been caused by starvation she experienced in the unaccounted-for days after she disappeared on November 15, 2002, before her death (by defense reckoning) on November 21 or 22, 2002.
 

 The defense theory of the case was that Jennifer Kocke killed her own daughter and that defendant had confessed to the crime to spare his estranged wife [aawhom he still loved. She had given him the details of the crime to relate to the police in his confession, the reason why, counsel suggested, defendant referred in his videotaped statement to the underwear found on the scene as boxers, not panties, a mistake that no man would make unless he was merely relying information given to him from another source, namely Jennifer, who testified at trial that her daughter occasionally slept in blue or burgundy boxers. The crime scene was staged, counsel theorized, in such a way that defendant could find it after Jennifer gave him directions to that location, marked by the red panties which served as a “red flag” pointing the way.
 

 The trial transcript shows that the defense had a fair opportunity to present its theory of the case to the jurors. It also appears that jurors rationally rejected that theory in favor of the state’s case which, overall accounted for almost all of the evidence in the case, including the seminal fluid found in Courtney LeBlanc’s cervix for which the defense had no explanation consistent with its theory that Jennifer Kocke alone had killed her daughter. That defendant led the authorities to the body, hidden in a location so obscured by
 
 *863
 
 underbrush that Michael Cuehinelli never saw it, although he was only 15 feet away when he recovered the knife that had been removed from the kitchen of Jennifer Kocke’s trailer, constituted powerful evidence corroborating defendant’s confession, as did the recovery of the knife itself. It also clearly appears from the videotaped statement viewed by jurors that it was F.B.I. Agent Methvien conducting the interview, and not defendant, who initially and repeatedly referred to Courtney’s underwear as boxers, not panties, a description the agent continued to use at trial in his testimony. At only one moment in his statement and in a response prompted by a specific question by the agent did defendant refer to the “boxers” in his car.
 

 laaAt the time of the offense in November, 2002, the definition of aggravated rape had come to include oral sexual intercourse.
 
 See
 
 2001 La. Acts 801. On the basis of the evidence at trial, any rational trier of fact could find that defendant killed his stepdaughter during the commission of an aggravated rape when she submitted to his demand for oral sex after he had armed himself with the knife from Jennifer Kocke’s kitchen and threatened to kill her if she did not do what he demanded.
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); La. R.S. 14:42(A)(2) and (3).
 
 [7]
 
 Similarly, any rational trier of fact could find that defendant had committed the offense of
 

 second degree kidnapping by forcibly abducting Courtney from the trailer and taking her into Mississippi for purposes of facilitating the commission of a felony offense involving a sexual assault. R.S. 14:44.1 (A)(2) and (3). Thus, defendant’s death sentence rests on an aggravating circumstance fully supported by the evidence presented at trial. It further appears that wholly apart from his post-verdict statements confessing to the crime, the risk that defendant has been erroneously convicted and will be executed for a crime committed by his wife is so remote that it does not implicate the Eighth Amendment.
 

 Arbitrary Factors
 

 13,[The sentencing hearing began with defense counsel informing the trial court that defendant had instructed him not to present a defense case in mitigation. Counsel expressed his strong dismay and informed the court that he might have to bind and gag his own client to go forward with the evidence that he intended to present. For the record, counsel stated that he had retained the services of a mitigation expert who conducted a social history for defendant as the basis for anticipated testimony from Dr. Sarah Deland, a psychiatrist, that defendant suffered from an impulse control disorder. He further indicated that defendant’s sister, Cindy Landry, was prepared to testify in his behalf
 
 *864
 
 but that he had also instructed her not to do so.
 

 The trial court conducted an extensive colloquy with defendant, in which it explained his right to present mitigating evidence and stressed the importance of that right in view of the potential consequences of the sentencing hearing. Defendant remained steadfast in his decision not to present the mitigating evidence prepared by counsel. On the basis of his colloquy with defendant, the trial court determined that he made a knowing and intelligent waiver of his right to present mitigating evidence. The jury therefore heard only from the state’s witnesses during the sentencing phase.
 

 Defendant’s decision implicated bedrock principles that have shaped evolving capital jurisprudence over the past 30 years. A defendant in a capital case has the Sixth Amendment right to reasonably effective counsel “acting as a diligent, conscientious advocate for his life.”
 
 State v. Myles,
 
 389 So.2d 12, 30 (La.1980)(on reh’g) (citations omitted). He also has an Eighth Amendment right to have his jury “consider and give effect to mitigating evidence relevant to [his] character or record or the circumstances of the offense.”
 
 Penry v. Lynaugh,
 
 492 U.S. 302, 327-28, 109 S.Ct. 2934, 2951, 106 L.Ed.2d 256 (1989). The sentencer in a capital case therefore must be allowed to consider “ ‘as a mitigating factor, any aspect of a defendant’s character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.’ ”
 
 Blystone v. Pennsylvania,
 
 494 U.S. 299, 304-05, 110 S.Ct. 1078, 1082, 108 L.Ed.2d 255 (1990)(quoting
 
 Lockett v. Ohio,
 
 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978))(emphasis in original; footnote omitted). Thus, reasonably competent counsel acting as a diligent advocate for his client’s life in a capital case must investigate, prepare, and present, even without the active cooperation of the defendant, relevant mitigating evidence at a capital sentencing hearing.
 
 Rompilla v. Beard,
 
 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005);
 
 Wiggins v. Smith,
 
 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).
 

 However, in the present case, the limitations on the defense at the sentencing phase were self-imposed by defendant. We addressed a similar situation in
 
 State v. Felde,
 
 422 So.2d 370 (La.1982), in which the defendant, on trial for taking the life of a police officer who had arrested him for public intoxication, took the stand during the sentencing phase and asked the jury to return the death penalty, advising jurors that he would be unable to control his future actions and that other deaths would occur if he received a life sentence. Counsel further informed jurors during closing argument that he could not think of a single reason why jurors should spare the defendant’s life. Counsel thus abided by an agreement with defendant, as a condition of employment, that he would not attempt to secure any verdicts other than not guilty by reason of insanity or guilty as charged with capital punishment. This Court held that counsel did not render ineffective assistance when he followed defendant’s instructions because “a defendant can limit his defense consistent with |sr,his wishes at the penalty phase of trial.”
 
 Felde,
 
 422 So.2d at 395;
 
 accord State v. Dodd,
 
 120 Wash.2d 1, 838 P.2d 86 (1992);
 
 cf. Schriro v. Landrigan,
 
 550 U.S. 465, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007)(a defendant who has expressly instructed counsel not to present mitigating evidence at capital sentencing hearing cannot satisfy prejudice prong of the test for ineffective assistance of counsel set forth in
 
 Strickland v. Washington,
 
 466 U.S. 668,
 
 *865
 
 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), by showing the counsel failed to investigate and prepare relevant mitigating evidence for the sentencing hearing). The premise of our holding in
 
 Felde
 
 was that “there is clear and convincing evidence in this record ... that the defendant knowingly and voluntarily waived the right to have his counsel plead for his life.”
 
 Id.,
 
 422 So.2d at 398 (Dennis, J., concurring).
 

 In the present case, as
 
 Felde,
 
 there is clear and convincing evidence in the record of the sanity commission proceedings involving Drs. Areetona and Le-Bourgeois that defendant had the capacity to make a knowing and intelligent waiver of his right to present mitigating evidence and that he did so explicitly during his colloquy with the trial judge at the outset of the sentencing phase. Given our holding in
 
 Felde,
 
 we do not consider that the decision of defendant not to present the mitigating evidence counsel had prepared for the penalty phase interjected an arbitrary factor into the proceedings that now serves as a basis for vacating his sentence of death.
 

 In conducting this aspect of Rule 28 review, we have also considered the observation of the trial judge in completing the Uniform Capital Sentence Report that “[t]here was extensive publicity in the community concerning this case in the form of television and newspaper coverage,” although the court also expressed its opinion that the jury had not been influenced by passion, prejudice or any other |37arbitrary factor in returning its sentence of death. Defense counsel filed a motion to change venue before trial alleging that because of extensive media coverage of the case, defendant’s trial could not take place in Livingston Parish or any adjoining parish within the 21st Judicial District. The trial court deferred ruling on the motion to jury selection at trial. At the close of voir dire examination, after selection of the panel of 12 jurors and four alternates, counsel renewed the motion, stating for the record that “[virtually every person that we questioned had an opinion of varying degrees concerning this case and, more specifically, the guilt or innocence of the defendant.” Counsel also observed that “the venom was palpable” in the courthouse lobby as the prospective jurors were milling about, and that he had “never encountered that in the parish before.” The trial court denied the motion, observing that jury selection had taken only three days, although the court had expected to spend six to seven days selecting the panel, that only half of the prospective jurors had been questioned, and that, in the end, “[t]he proof is always in the pudding and now we have a jury.”
 

 Our independent review of jury selection indicates that a total of 82 prospective jurors in six panels were called for voir dire examination over the course of three and one-half days from June 19, 2006, to midday on June 22, 2006. The trial court initially questioned the jurors with regard to their exposure to media coverage of the crime and about their attitudes towards capital punishment. The court then provided counsel for the state and defendant with the opportunity to address the same concerns with the prospective jurors, after which it entertained cause challenges on those two grounds before permitting the state and defense to questions the prospective jurors generally. The record shows that the court granted a total of 24 cause challenges, many of them by stipulation of both sides, on the |asbasis that the jurors had expressed fixed opinions as to the defendant’s guilt or innocence, or 29.3% of the prospective jurors called for voir dire examination.
 

 The responses of the jurors during voir dire show that nearly all of the prospective
 
 *866
 
 jurors had heard about the case to one extent or another and that many of them had formed at least an initial opinion of the defendant’s guilt or innocence, although a substantial number of the jurors indicated a willingness to set aside their opinions and to decide the case on the evidence presented at trial. This expressed willingness accounted for the final tally of less than one-third of the questioned jurors excused for cause on grounds of their fixed opinions as to defendant’s guilt. In that regard, the trial court noted when it denied the motion to change venue that “unless we have a bunch of bal[d]-faced liars on this jury and I have carefully evaluated the credibility of each one ... they can be fair and impartial.”
 

 As a general rule, a trial court shall change the venue of a prosecution “when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence ... a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.” La. C. Cr. P. art. 622. In making that determination, the court shall consider whether “the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial.”
 
 Id.
 
 However, a defendant cannot meet his burden under art. 622 “merely by showing that there exists public knowledge of the facts surrounding the offense or the alleged offender.... [T]he defendant must prove more than mere public knowledge or familiarity with the facts of the case to be entitled to have his trial moved to another parish; rather, the defendant must show the extent of prejudice in the minds of the community as a result of such knowledge or exposure to the case before trial.”
 
 State v. Frank,
 
 99-0553,39 p. 14 (La.1/17/01), 803 So.2d 1, 14-15. Thus, “ ‘[t]o hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror’s impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence present in court.’ ”
 
 Murphy v. Florida,
 
 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975)(quoting
 
 Irvin v. Dowd,
 
 366 U.S. 717, 723, 81 S.Ct. 1639, 1642-43, 6 L.Ed.2d 751 (1961)).
 

 In the present case, defense counsel did not introduce any evidence before trial or during voir dire examination in support of the motion to change venue to establish the nature, content, and scope of the media coverage. At formal sentencing, when the Capital Appeals Project argued the grounds asserted in its motion for a new trial, including the court’s denial of the motion to change venue, counsel introduced an exhibit containing 126 news articles about the case that were published before trial. However, counsel did not argue that the articles, either individually or collectively, were prejudicial or inflammatory, or that they reflected anything more than factual accounts of the investigation into Courtney LeBlanc’s disappearance and murder and defendant’s arrest for the crime. The exhibit thus confirmed only what had already been made clear during voir dire examination, that the case had been the focus of considerable pretrial publicity.
 

 In the absence of any allegation by the Capital Appeals Project (arguing the motion over defendant’s opposition) that the trial atmosphere had been utterly corrupted by the extent of the media exposure,
 
 see Murphy,
 
 421 U.S. at 799, 95 S.Ct. at 2036 (discussing
 
 Estes v. Texas,
 
 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) and
 
 Sheppard v. Maxwell,
 
 384 U.S. 333, 86
 
 *867
 
 S.Ct. 1507, 16 L.Ed.2d 600 (1966)), the lengths to which the trial court had to go to impanel a jury appears of paramount concern. That the court had to excuse less than 30% of the jurors questioned during voir dire examination on grounds of a fixed opinion as to the guilt or innocence of the defendant indicates that a fair trial for defendant was not impossible in Livingston Parish.
 
 See Murphy,
 
 421 U.S. at 803, 95 S.Ct. at 2037-38 (that 20 of the 78 venire persons were excused because of their opinion about defendant’s guilt [26%] “may indeed be 20 more than would occur in the trial of a totally obscure person, but it by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own.”);
 
 see also State v. Lee,
 
 05-2098, p. 40 (La.1/16/08), 976 So.2d 109, 137 (“[Cjonsidering that less than one-third [32%] of the prospective jurors were excused because of their inability to put aside their pre-trial exposure .... [defendant fails to show the existence of pretrial publicity was such that it would color the jurors’ voir dire responses to the point of making them unreliable and that he was therefore deprived of his right to trial by a fair and impartial jury.”);
 
 State v. Frank,
 
 99-0553 at 18, 803 So.2d at 17 (cause challenges to 20-25% of prospective jurors on the basis of fixed opinions as to guilt “not so high or outrageous as to justify any presumption of community-wide prejudice.”); compare
 
 Irvin v. Dowd,
 
 366 U.S. at 728, 81 S.Ct. at 1645 (when 268 of 430 venirepersons, or 62%, were excused for cause, “it is not requiring too much that petitioner be tried in an atmosphere undisturbed by so huge a wave of public passion and by a jury other than one in which two-thirds of the members admit, before hearing any testimony, to possessing a belief in his guilt.”) (citations omitted). In this respect, we accord due weight to the trial court’s determinations as to the credibility of jurors who acknowledged initial opinions about defendant’s guilt but professed a |41 willingness to decide the case on the basis of the evidence introduced at trial.
 
 See State v. Carmouche,
 
 01-0405, p. 17 (La.5/14/02), 872 So.2d 1020, 1033 (A trial judge is accorded broad discretion in ruling on the fitness of jurors to serve on the panel because “the judge has the benefit of seeing the facial expressions and hearing the vocal intonations of the members of the jury venire as they respond to questioning by the attorneys.... Such expressions and intonations are not readily apparent at the appellate level where review is based on a cold record.”) (citation omitted). Our independent review of the record discloses no basis to set aside the trial court’s ruling on the motion to change venue.
 

 We thus find that the jury’s recommendation of the death penalty was not influenced by passion, prejudice, or any other arbitrary factor.
 

 Proportionality
 

 Although the federal Constitution does not require proportionality review,
 
 Pulley v. Harris,
 
 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration under Rule 28 in determining the issue of excessiveness in Louisiana.
 
 State v. Burrell,
 
 561 So.2d 692, 710 (La.1990);
 
 State v. Wille,
 
 559 So.2d 1321, 1341 (La.1990). However, this Court has set aside only one death penalty as disproportionately excessive under the post-1976 statutes, finding in that one case,
 
 inter alia,
 
 a sufficiently “large number of persuasive mitigating factors.”
 
 State v. Sonnier,
 
 380 So.2d 1, 9 (La.1979);
 
 cf. State v. Weiland,
 
 505 So.2d 702, 707-10 (La.l987)(reversing on other grounds but suggesting that the death penalty was disproportionate). As required by Rule 28, this Court reviews
 
 *868
 
 death sentences to determine whether the sentence is disproportionate to the penalty imposed in other similar cases, considering both the offense and the offender, on the premise that if the jury’s | ^recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises.
 
 Sonnier, 380
 
 So.2d at 7. For purposes of effectuating that review, Rule 28 also requires the state to submit a sentence review memorandum listing all first degree murder prosecutions instituted in the district in which sentence, whether death or a lesser penalty, was imposed after January 1, 1976. However, comparative proportionality review does not require uniformly consistent results which are not possible in any system that counts on juries to make individualized decisions.
 
 Pulley,
 
 465 U.S. at 54, 104 S.Ct. at 881 (“As we have acknowledged in the past, there can be no perfect procedure for deciding in which cases governmental authority should be used to impose death.”)(internal quotation marks and citations omitted). Proportionality review serves as another aid to this Court in identifying the truly aberrant case in which, despite the channeling of the jury’s sentencing discretion, the verdict appears nothing more than the “wanton and freakish” imposition of capital punishment akin to the strike of lightening.
 
 Furman v. Georgia,
 
 408 U.S. 238, 92 S.Ct. 2726, 2762-63, 33 L.Ed.2d 346 (1972)(Stewart, J., concurring). As a general matter, appellate review of sentences for excessiveness in Louisiana under the authority of La. Const, art. I, § 20 is a cumulative process which “focuses on a combination of ... factors ... [including] the nature of the offense and the offender .... [and] comparison of the defendant’s punishment with the sentences imposed for similar crimes by the same court and other courts.”
 
 State v. Telsee,
 
 425 So.2d 1251, 1253-54 (La.1983) (citations omitted).
 

 The state’s Sentence Review Memorandum reveals that since 1979, 21 cases have originated as first degree, murder prosecutions in Livingston Parish, including the defendant’s. Of those cases, juries have recommended the death penalty for hopnly four defendants. The first, George Brooks, participated with his co-defendant James Copeland in the repeated rape and eventual murder of an 11-year-old boy. After initially remanding his case to the trial court for a hearing on a motion for a new trial, this Court affirmed Brooks’s conviction and sentence on direct appeal.
 
 State v. Brooks,
 
 505 So.2d 714 (La.1987). However, in post-conviction proceedings, the Court then granted Brooks a new trial on grounds that he had received ineffective assistance of counsel at both stages of his first trial.
 
 State v. Brooks,
 
 94-2438 (La.10/16/95), 661 So.2d 1333. The disposition of this case on remand remains unknown. The second defendant, Thomas Sparks, a/k/a Abdullah Hakim el-Mumit, shot and killed a Tangi-pahoa Parish Sheriffs deputy. El-Mumit was convicted and sentenced to death. However, his appeal in this case,
 
 State v. Sparks,
 
 88-0017, has been in abeyance for years after the Court remanded the case for evidentiary proceedings related to the defendant’s new trial motion and the appeal has only recently been revived. Thus, neither case is useful in proportionality review. As for Copeland, he was tried and convicted in Tangipahoa Parish, also a part of the 21st Judicial District, and sentenced to death. Copeland’s first appeal to this Court resulted in reversal of his conviction and sentence.
 
 State v. Copeland,
 
 419 So.2d 899 (La.1982). Following retrial, Copeland was again convicted of first degree murder and sentenced to death. On appeal, this Court affirmed both the con
 
 *869
 
 viction and sentence.
 
 State v. Copeland,
 
 530 So.2d 526 (La.1988). The fourth defendant, Michael Weary, along with several co-defendants, brutally murdered a classmate after he delivered pizza at a nearby residence. The jury found him guilty of first degree murder and the court sentenced him to death on April 17, 2002. This Court affirmed his conviction and sentence.
 
 State v. Weary,
 
 03-3067 (La.4/24/06), 931 So.2d 297.
 

 144Thus, of the death sentences meted out by juries in the 21st Judicial District, only the cases of Copeland and Brooks appear similar to defendant’s, as they kidnapped, sexually assaulted, and then murdered an 11-year-old boy, and only Copeland’s has resulted in a final sentence of death that may be reliably compared to the present case. The other first degree murder prosecutions which resulted in life sentences or less in the 21st Judicial District do not appear remotely similar.
 

 Given a paucity of cases within a district to compare, this Court has either concluded proportionality review without further analysis,
 
 Felde,
 
 422 So.2d at 398 (“Thus, there are no similar cases, and this sentence cannot be held disproportionate to sentences in other cases.”), or, far more frequently, conducted proportionality review on a state-wide basis.
 
 See, e.g., State v. Reeves,
 
 06-2419, p. 87 (La.5/5/09), 11 So.3d 1031, 1087;
 
 State v. Davis,
 
 92-1623, pp. 34-35 (La.5/23/94), 637 So.2d 1012, 1030-31. Over the course of the past 30 years, death sentences returned in capital cases based primarily on the jury’s finding that the defendant killed the victim in the course of an aggravated rape or attempted aggravated rape which may also have involved the kidnapping of the victim have not been uncommon.
 
 State v. Thibodeaux,
 
 98-1673, p. 31 (La.9/8/99), 750 So.2d 916, 939 (“Cases are legion in which this court has affirmed capital sentences based primarily on the jury’s finding that the defendant killed during the perpetration or attempted perpetration of an aggravated rape.”)(collecting cases).
 
 [8]
 
 |4SFor example, expanding the review over the parish line from Livingston Parish into the 19th Judicial District, with its major metropolitan center of Baton Rouge, encompasses 78 capital cases, four of which involved the death of the victim during an aggravated rape, and three of which resulted in sentences of death.
 
 See State v. Cosey,
 
 97-2020 (La.11/28/00), 779 So.2d 675;
 
 State v. Miller,
 
 99-0192 (La.9/6/00), 776 So.2d 396;
 
 State v. Jones,
 
 474 So.2d 919 (La.1985). Thus, the pool of similar cases involving the murder of the victim during the com
 
 *870
 
 mission of an aggravated or forcible rape which resulted in death sentences has become sufficiently large that, even assuming the pool of similar cases which did not result in death is also significant, it appears that juries generally throughout the state have imposed the death penalty for similar crimes.
 
 Cf. State v. Frost,
 
 97-1771, p. 27 (La.12/1/98), 727 So.2d 417, 438 (“[Ajlthough counsel argues correctly in his Sentence Review Memorandum that proportionality review should include
 
 all
 
 similar first-degree murder prosecutions including those which resulted in non-capital verdicts and/or sentences, the relevant pool of capital sentences based in part or entirely on armed robbery murder is now so large that this defendant’s sentence does not reflect the wanton and freakish infliction of capital punishment, no matter how large the relevant pool of similar non-capital cases.”). Accordingly, the death sentence returned in the present case does not appear simply by its own terms a truly aberrational result that is grossly disproportionate to the crime.
 
 State v. Bonanno,
 
 384 So.2d 355, 358 (La.1980)(“To determine whether the penalty is |4f,grossly disproportionate to the crime we must consider the punishment and the crime in light of the harm to society caused by its commission and determine whether the penalty is so disproportionate to the crime committed as to shock our sense of justice.”) (citation omitted).
 

 Rule 28 sentence review for excessive in the present case thus retains its focus on the character of the offender and the circumstances of the crime. The Uniform Capital Sentence Investigation Report reveals that defendant is a white male born on February 19, 1962. Defendant was 40 years old at the time of the offense and is now 47 years old. He attended Baton Rouge area schools through the ninth grade but was considered impaired and placed in special resource classes. Upon entering high school, defendant’s mother removed him from school on the advice of the principal. Defendant then attended trade school where he became an automotive mechanic specializing in diesel engines. He gained employment in a SAAB dealership and also worked as a gas station attendant. Following his release on parole in 2000 on his second felony conviction, he began working with Delta Concrete, and was employed by Delta at the time of his arrest. As indicated by the reports of Drs. Arcetona and LeBourgeois, defendant claimed to have obtained his GED while in prison and completed several college level correspondence business courses. As an adult, he has two prior felony convictions which also involved sexual assault.
 
 [9]
 
 Drs. Arcetona and LeBour-
 
 *871
 
 geois agree that defendant suffers from |47anti-social personality disorder and sexual sadism disorder but that he has an IQ in the normal range and does not appear to have any organic brain impairments that would result in abnormal mental functioning.
 

 In the sentencing hearing, the state placed before jurors documentary evidence relating to defendant’s prior convictions. It thereby established that in 1982, defendant pleaded guilty to sexual battery in violation of La. R.S. 14:48.1, and received a sentence of 10 years at hard labor. In 1990, defendant was convicted of forcible rape in violation of La. R.S. 14:42.1, and on two counts of aggravated crime against nature in violation of La. R.S. 14:89.1. He received a total sentence of 20 years imprisonment at hard labor and was on parole for those crimes at the time he killed Com’tney LeBlanc.
 
 [10]
 

 In addition, the state called the victims of his prior crimes at the sentencing stage to inform jurors of the circumstances surrounding the sexual assaults. Cynthia Renee Cullivan (Sustrom) testified that on March 17, 1982, as she walked home in Baton Rouge, defendant stopped and offered her a ride in his car. After she got into his vehicle, defendant pulled out a knife and held it to her as he 14Rabducted her and drove her to a residence in which, in the back bedroom, he forced her to have oral sex twice as he continued to hold the knife against her. In response to a specific question by the prosecutor, she testified that defendant ejaculated in her mouth both times. He then drove her home. Cullivan was 18 years old at the time. Kathryn Brown (Miller) testified that on June 14, 1990, as she was walking past a field on Florida Avenue in East Baton Rouge Parish near the Amite River, defendant jumped out, grabbed her at knife point, and dragged her across the field by her throat to his car. He then pushed her into the vehicle and drove to an abandoned building where he got her out and forced her to perform oral sex on him and then performed oral sex on her. He then raped her vaginally against the wall of the building. On this occasion, defendant did not drive his victim home. As Miller walked away from the scene she fortuitously caught a ride from Cindy Landry, defendant’s sister. According to Miller, when she described what had happened to her, Landry exclaimed, “That’s my brother.” When they arrived at the apartment of Miller’s mother, the victim got out of Landry’s ear as fast as she could. Miller was 22 years old at the time.
 

 In addition, jurors also heard from Jennifer Kocke, called as a victim-impact witness to describe what the loss of her daughter meant to her and to express the bitter irony at the heart of daughter’s
 
 *872
 
 death. “Even after the misuse of her trust in Mississippi,” Kocke told jurors, “she still attempted to save Gerald’s life when he was electrocuted, only for him to come back in a week and rape and murder her.”
 

 Although defendant has a diagnostic profile of sexual sadism, the circumstances of Courtney LeBlanc’s murder were not nearly as repellant as those in
 
 State v. Brogdon,
 
 457 So.2d 616, 621 (La.1984), which we described as of “unparallel savagery and brutality” on the basis of evidence that the defendant and |4!)his companion repeatedly raped the victim and forced her to perform multiple acts of oral sex as they pummeled her with their fists, gouged her body with the jagged edges of broken glass bottles, beat her with a brick until they thought she was dead, and at some point during the ordeal shoved one or two pointed sticks up and through her vagina and into her abdominal cavity.
 
 Brogden,
 
 457 So.2d at 621. Nor were the circumstances of Courtney LeBlanc’s death comparable to those in
 
 State v. Sawyer,
 
 422 So.2d 95 (La.1982),
 
 ajfd after remand,
 
 442 So.2d 1136 (La.1983), in which defendant and his companion, in the course of raping the victim, dunked her body into scalding water, beat her, and set fire to her genitals with lighter fluid. In the present case, defendant’s crime thus does not fall into the class of similar cases constituting the most serious violations of the charged crime.
 
 State v. Quebedeaux,
 
 424 So.2d 1009, 1014 (La.1982)(as a general rule, maximum sentences are reserved for the worst offenders and the most serious violations of the charged offense).
 

 On the other hand, a jury in East Baton Rouge Parish returned a verdict of death in
 
 State v. Jones,
 
 474 So.2d 919 (La.1985), under circumstances strikingly similar to the present case in which the defendant abducted the 11-year-old daughter of his estranged girlfriend, raped her and choked her to death, and left her partially nude body in a drainage canal. Jones has been executed for that crime. In the present case, all of defendant’s crimes involved a similar pattern involving the forcible abduction of his victims in the course of sexually assaulting them after he had armed himself with a knife, and, as he pointed out to the sanity commission doctors, an escalating pattern of violence which culminated in the strangulation death of his stepdaughter, an act of particular heartlessness in view of her role in reviving him only one week before in the electrical accident at the trailer.
 

 | .^Defendant’s conduct in the present case and in his prior crimes stamped him as a particularly dangerous and ruthless sexual predator who had preyed upon young women for most of his adult life and then turned at the last to an adolescent girl within his wife’s family. Given all of the circumstances, we cannot say that this jury’s verdict does not represent the community’s reasoned judgment of his moral and legal culpability for his crime but constitutes a grossly disproportionate response that shocks the sense of justice.
 

 Accordingly, because we have granted defendant’s motion to waive his direct appeal, and because our Rule 28 review reveals that the death penalty imposed on defendant is not excessive, the appeal of his conviction for first degree murder and sentence of death is hereby dismissed. We do not anticipate that defendant will seek rehearing of our decision or pursue any other avenue of review, including an application for certiorari to the United States Supreme Court. Therefore, upon finality of this decision 15 days after it is rendered, and thus upon finality of defendant’s conviction and sentence, the district court shall, in conformity with La. R.S. 15:567, forward to the secretary of the Department of Public Safety and Corrections a certified copy of the indictment,
 
 *873
 
 verdict, sentence, and judgment of this Court dismissing defendant’s appeal and thereby rendering the verdict and sentence final. The district court shall also issue a warrant commanding the secretary to cause the execution of the defendant specifying a date upon which he is to be put to death, not less than 60 days nor more than 90 days from the date the warrant is issued.
 

 APPEAL DISMISSED; CASE REMANDED FOR EXECUTION OF SENTENCE.
 

 [1]
 

 . Judge Benjamin Jones, of the Fourth Judicial District Court, assigned as Justice
 
 Pro Tempore,
 
 participating in the decision.
 

 [2]
 

 . The current total is apparently 133 or 12% of the appeals.
 
 See
 
 Criminal Justice Project of the NAACP Legal Defense and Educational Fund, Inc.,
 
 Death Row U.S.A.
 
 (Winter 2009).
 

 [3]
 

 . In the case of Scott Judge Bourque, this Court initially affirmed his conviction for first degree murder but vacated his death sentence and remanded the case to the district court for a second penalty hearing.
 
 State v. Bourque,
 
 622 So.2d 198 (La.1993). Bourque was resentenced to death and appealed. He then made his request to dismiss his second capital appeal after briefs on the merits had already been filed. This Court issued an order directing the trial court to determine Bourque’s competency to waive his appeal but specifically provided that the proceedings below would not affect the progress of the appeal, which the Court then decided in due course.
 
 State v. Bourque,
 
 96-0842 (La.7/1/97), 699 So.2d 1. Our opinion issued some three months before the district court conducted its hearing in November, 1997, and determined that Bourque in fact was not competent to waive direct review of his capital sentence. This Court accordingly dismissed further proceedings on the motion and committed Bourque to post-conviction proceedings represented by new.counsel.
 
 State
 
 
 *846
 
 ex
 
 rel. Bourque v. State,
 
 96-2752 (La.3/17/00), 760 So.2d 308;
 
 see State ex rel. Bourque v. Cain,
 
 03-0602 (La. 1/7/05), 892 So.2d 1237 (remanding for a hearing on Bourque’s claim that he is not competent to proceed to execution).
 

 [4]
 

 . In
 
 State v. Felde,
 
 422 So.2d 370, 395 (La.1982), this Court observed in dicta that “[a] defendant cannot waive his right to appeal a death sentence.” However, the Court cited to La. C. Cr. P. art. 905.9, mandating this Court’s Rule 28 review of sentence only, and to cases from jurisdictions in which appeal of a capital conviction and sentence of death is by statute automatic,
 
 i.e.,
 
 California and Florida. In any event, we herewith resolve any ambiguity in
 
 Felde
 
 by holding that a defendant may waive direct appeal of his capital conviction and sentence of death, subject to this Court's Rule 28 review of his sentence.
 

 [5]
 

 . For its Rule 28 review, this Court had the record on appeal supplemented with a DVD copy of the confession.
 

 [6]
 

 . Counsel had also called Dr. Cenac for another purpose. He had proffered for introduction into evidence several printed letters ostensibly sent to the defendant in the Livingston Parish jail. These letters, profane in language and filled with threats against defendant, were, at least in counsel’s view, evidence that Jennifer Kocke was urging defendant to "stick to the plan” to accept in court responsibility for a crime she committed, although the letters also contained threats if he persisted in offering a defense that Kocke had killed her own daughter.
 

 Dr. Cenac proposed to testify that based on the content of the letters, the author was a female and someone with direct knowledge of the circumstances of the crime and with intimate knowledge of defendant's various family members. The psychiatrist was prepared to testify that within the small subset of women who could have written the letters, Jennifer Kocke was the most likely author. The state objected, and tire trial court agreed, that Dr. Cenac's purported technical knowledge in identifying the author of anonymous death threat letters did not meet the criterial established by
 
 Daubert v. Merrell Dow Pharmaceuticals, Inc.,
 
 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and
 
 Kumho Tire Co. v. Carmichael,
 
 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), for admitting opinions based on scientific or technical knowledge.
 

 Defendant has waived direct review of the trial court's ruling excluding the letters and although the defense proffered them again at the sentencing stage, we do not consider that exclusion of the evidence had any bearing on the reliability of jury's sentencing verdict.
 

 [7]
 

 . Venue of prosecution is not an element of the offense but a jurisdictional matter for the court to decide in advance of trial. La. C. Cr. P. art. 615. Although Courtney LeBlanc had almost certainly been killed where the police found her, across the parish line in East Baton Rouge Parish, venue of the prosecution was proper in Livingston Parish, where, according to defendant’s confession, she had been abducted at the outset of a continuous chain of events which led to her death at the Amite River. La. C. Cr. P. art. 611(A)(‘‘If acts constituting an offense or if the elements of an offense occurred in more than one place, in or out of the parish of state, the offense is deemed to have been committed in any parish in this state in which any such act or element occurred.”);
 
 cf. State v. Anthony,
 
 427 So.2d 1155, 1158 (La.1983)(‘‘When ‘res gestae’ has been used to determine whether the homicide was committed in the perpetration of a certain felony, it seems to have been a short way of saying that the underlying felony and the homicide form part of one continuous transaction which occurred without a significant break in the chain of events.”).
 

 [8]
 

 .
 
 See, e.g., State v. Reeves,
 
 06-2419 (La.5/5/09), 11 So.3d 1031;
 
 State v. Hoffman,
 
 98-3118 (La.4/11/00), 768 So.2d 542;
 
 State v. Connolly,
 
 96-1680 (La.7/1/97), 700 So.2d 810;
 
 State v. Comeaux,
 
 93-2729 (La.7/1/97), 699 So.2d 16;
 
 State v. Martin,
 
 93-0285 (La. 10/17/94), 645 So.2d 190;
 
 State v. Wille,
 
 595 So.2d 1149 (La.1992);
 
 State v. Lee,
 
 559 So.2d 1310 (La.1990);
 
 State v. Eaton,
 
 524 So.2d 1194 (La.1988);
 
 State v. Carmouche,
 
 508 So.2d 792 (La.1987);
 
 State v. Williams,
 
 490 So.2d 255 (La.1986);
 
 State v. Brogdon,
 
 457 So.2d 616 (La.1984);
 
 State v. Watson,
 
 449 So.2d 1321 (La.1984);
 
 State v. Rault,
 
 445 So.2d 1203 (La.1984);
 
 State
 
 v.
 
 Celestine,
 
 443 So.2d 1091 (La.1983);
 
 State v. Willie,
 
 436 So.2d 553 (La.1983);
 
 State v. Sawyer,
 
 422 So.2d 95 (La.1982),
 
 aff’d after remand,
 
 442 So.2d 1136 (La.1983);
 
 State v. Moore,
 
 414 So.2d 340 (La.1982).
 

 Excluded from this list of similar crimes are cases in which the defendant's death sentence was eventually vacated and he was resen-tenced to life imprisonment at hard labor.
 
 See State v. Loyd,
 
 489 So.2d 898 (La.1986),
 
 rev’d Loyd v. Whitley,
 
 977 F.2d 149 (5th Cir.1992)(remanded for new trial, defendant subsequently resentenced to life imprisonment at hard labor);
 
 State v. Flowers,
 
 441 So.2d 707 (La.1983),
 
 rev'd Flowers v. Blackburn,
 
 779 F.2d 1115 (5th Cir.l986)(remanded for new trial),
 
 State v. Flowers,
 
 509 So.2d 588 (La.App. 5th Cir.1987) (conviction and life sentence affirmed).
 

 [9]
 

 . The report indicates that defendant has no juvenile record. However, the sanity commission reports of Drs. Arcetona and LeBour-geois indicate that in February, 1979, when defendant was 17 years old, he faced charges of aggravated rape and simple kidnapping of an 18-year-old girl, whom he accosted at work and raped her anally after forcing her to perform oral sex. He was adjudicated delinquent but as an alternative to incarceration went to the Greenwell Springs Hospital for psychiatric treatment and rehabilitation. However, his stay ended only a few months later after the staff discovered that he had smoked marijuana in the hospital. Defendant was remanded to the Louisiana Training Institute for vocational education but released on probation approximately one year later. In July, 1981, his probation was terminated. Shortly thereafter, defendant was charged as an adult for the sexual assault of Cynthia Cullivan, leading to his first conviction in 1982 for sexual battery.
 

 The discrepancy between the reports of Drs. Artecona and LeBourgeois and the Uniform Capital Sentence Investigation Report is unexplained and unresolved but has no material bearing on our Rule 28 review because jurors were not in any event informed of the juvenile adjudication (if it occurred),
 
 cf. State v. Jackson,
 
 608 So.2d 949, 956-57
 
 *871
 
 (La.l992)(juvenile adjudications of delinquency for felony-grade acts admissible as character and propensity in capital sentencing hearings), and we will assume that defendant, in fact, had no prior serious juvenile record.
 

 [10]
 

 . The state had also proposed to introduce evidence that out of frustration over the failure of prison authorities in the Livingston Parish jail to transfer him to the penitentiary at Angola, defendant set fire to his jail cell on October 14, 2004, forcing the removal of some of the other inmates from the hallway. The state argued that defendant had thereby committed the crime of aggravated arson in violation of La. R.S. 14:51 because he had created a foreseeable risk to human life and that the offense therefore constituted character and propensity evidence under this Court’s decision in
 
 State v. Jackson,
 
 608 So.2d 949 (La.1992). However, apparently agreeing with the defense that the fire had not in fact endangered the other inmates or jail personnel because it had been extinguished immediately, the trial court found that the offense constituted at most simple arson, La. R.S. 14:52, and excluded it from the sentencing phase.